Slip Op. 18-43

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **GOVERNMENT OF SRI LANKA,** | |
| Plaintiff, | |
| **CAMSO INC., CAMSO LOADSTAR (PRIVATE) LTD., and CAMSO USA INC.,** | |
| Plaintiff-Intervenors, | **Before: Jane A. Restani, Judge** |
| .v. | |
| **UNITED STATES,** | **Consol. Court No. 17-00059** |
| Defendant. | |

### OPINION

Dated: April 17, 2018

[Commerce's final results in countervailing duty investigation of OTR tires from Sri Lanka remanded.]

Kristen Smith, Arthur Purcell and Emi Ortiz, Sandler, Travis & Rosenberg, PA, of Washington, DC, for Plaintiff Government of Sri Lanka.

Kevin O'Brien and Christine Streatfeild, Baker & McKenzie, LLP, of Washington, DC, for Consolidated Plaintiffs Camso Inc., Camso USA, Inc., and Camso Loadstar (Private) Ltd.

John Todor, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. Of counsel on the brief was Khalil Gharbieh, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

**Restani, Judge:** In this action challenging a final determination and countervailing duty order issued by the United States Department of Commerce ("Commerce") regarding off-the-road ("OTR") rubber tires from Sri Lanka, the Government of Sri Lanka ("GSL"), Camso Inc.,

Camso Loadstar (Private) Ltd., and Camso USA Inc. (collectively "Camso") (all the foregoing, collectively "plaintiffs"), request that the court hold Commerce's countervailing duty determination to be unsupported by substantial record evidence or otherwise not in accordance with the law, and remand this matter accordingly.

## BACKGROUND

Following a petition alleging twenty-two countervailable Sri Lankan programs, Commerce initiated a countervailing duty investigation into sixteen programs related to certain new pneumatic OTR tires from Sri Lanka, India, and the People's Republic of China. Certain New Pneumatic Off-the-Road Tires From India, the People's Republic of China, and Sri Lanka: Initiation of Countervailing Duty Investigations, 81 Fed. Reg. 7,067 (Dep't Commerce Feb. 10, 2016). Commerce selected Camso, the largest OTR manufacturer in Sri Lanka, as the sole mandatory respondent in the Sri Lankan investigation. Respondent Selection for the Countervailing Duty Investigation of Certain New Pneumatic Off-The-Road Tires from Sri Lanka, C-542-801, POI 01/01/2015-12/31/2015 (Dep't Commerce Feb. 25, 2016). In its preliminary determination, Commerce identified a subsidy margin for the following two programs: Tax Concessions for Exporters of Non-Traditional Products ("TCENTP") and the National Building Tax ("NBT"). Certain New Pneumatic Off-the-Road Tires From Sri Lanka: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Determination, 81 Fed. Reg. 39,990 (Dep't Commerce June 20, 2016) ("Prelim. Det."); Decision Memorandum for the Affirmative Preliminary Determination in the Countervailing Duty Investigation of Certain New Pneumatic Off-The-Road Tires from Sri Lanka, C-542-801,

POI 01/01/2015-12/31/2015, at 10–11 (Dep't Commerce June 13, 2016) ("Prelim. Det. I&D Memo").

Shortly before Commerce issued its preliminary determination, petitioners submitted subsidy allegations with respect to three additional Sri Lankan programs.  See generally Certain Off-the-Road Tires from Sri Lanka – Petitioners' New Subsidy Allegations, C-542-801, POI: 01/01/2015-12/31/2015 (May 4, 2016).   In the course of responding to these new allegations, GSL mentioned yet another program of interest to Commerce, the Guaranteed Price Scheme for Rubber ("GPS").   GOSL's CVD New Subsidy Allegations Supplemental Questionnaire Response: Certain Off-the-Road Tires From Sri Lanka, C-542-801, POI: 01/01/2015-12/31/2015, Attach. 1 (Aug. 1, 2016) ("GSL NSA Supp. Q. Response").   Commerce assessed these four programs in a post-preliminary determination, finding that, of these, only GPS provided a countervailable subsidy.   Post-Preliminary Analysis of Countervailing Duty Investigation: Certain New Pneumatic Off-The-Road Tires from Sri Lanka, C-542-801, POI: 01/01/2015-12/31/2015 (Dep't Commerce Aug. 18, 2016) ("Post-Prelim. Memo").

In its final determination, Commerce assigned a countervailing duty of 2.18 percent ad valorem to Camso.   Certain New Pneumatic Off-the-Road Tires From Sri Lanka: Final Affirmative Countervailing Duty Determination, and Final Determination of Critical Circumstances, 82 Fed. Reg. 2,949, 2950 (Dep't Commerce Jan. 10, 2017) ("Final Det.").   See also Certain New Pneumatic Off-the-Road Tires From India and Sri Lanka: Amended Final Affirmative Countervailing Duty Determination for India and Countervailing Duty Orders, 82 Fed. Reg. 12,556 (Dep't Commerce Mar. 6, 2017) ("Antidumping Order").   Of this, TCENTP accounted for 0.82 percent, and GPS for 0.95 percent.   Corrected Program Rates in the Issues

and Decision Memorandum Regarding the Countervailing Duty Investigation Concerning

Certain New Pneumatic Off-The-Road Tires (Off Road Tires) from Sri Lanka, C-542-801, POI

01/01/2015-12/31/2015, at 1 (Dep't Commerce Jan. 11, 2017) ("Corrected Program Rates").

Finally, 0.41 percent was associated with Exemptions and Concessions for Fiscal Levies on

Capital and Intermediate Goods, a program which Commerce had preliminarily determined did

not benefit Camso.   Issues and Decision Memorandum for the Final Determination in the

Countervailing Duty Investigation of Certain New Pneumatic Off-The-Road Tires from Sri

Lanka, C-542-801, POI 01/01/2015-12/31/2015, at 8 (Dep't Commerce Jan. 3, 2017) ("Final

Det. I&D Memo").   Commerce furthermore found that the NBT provided no benefit and was

therefore not countervailable.  Id. at 9.  GSL now challenges Commerce's determinations with

regard to the TCENTP program and GPS.  Camso challenges Commerce's determinations only

with regard to GPS.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Commerce's final results in

a countervailing duty investigation are upheld unless "unsupported by substantial evidence on

the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.       Relevance of the Agreement on Subsidies and Countervailing Measures**

GSL argues that its programs are covered by an exception to the prohibition on export

subsidies found in the World Trade Organization ("WTO") Agreement on Subsidies and

Countervailing Measures.  Corrected Rule 56.2 Brief of the Government of Sri Lanka, ECF No.

64-1, at 16 ("Pl. Br.") (citing Agreement Establishing the World Trade Organization, Apr. 15,

1994, 1869 U.N.T.S. 14, Annex 1A, Agreement on Subsidies and Countervailing Measures ("SCM Agreement").).  This exception applies to certain least-developed countries ("LDCs") indicated by Annex VII to the SCM Agreement.  Id. at Art. 27.  GSL's argument is unpersuasive.

The countervailing duty statute defines LDCs using Annex VII.   19 U.S.C. § 1677(36)(B)(i)–(ii) (expressly referring to SCM Agreement, Annex VII).  Instead of permitting export subsidies by LDCs, however, the countervailing duty statute raises LDCs' de minimis threshold, below which Commerce shall not impose duties to countervail any subsidies, to three percent.  19 U.S.C. § 1671b(b)(4)(C)(i).  It is well settled that, to the degree United States domestic law is inconsistent with the United States' international treaty obligations in the area of trade, the court shall apply domestic law and the remedy "is strictly a matter for Congress."  See, e.g., Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1348 (Fed. Cir. 2005); 19 U.S.C. § 2504(a) (2000).[1]  The provision raising LDCs' de minimis threshold states it "shall not apply . . .

---

[1] Further, even assuming some conflict exists, the SCM Agreement likely would not have entitled Sri Lanka to subsidize its exports at the time of Commerce's investigation.  In relevant part, Annex VII applies to:

(a) Least-developed countries designated as such by the United Nations . . .
(b) Each of the following developing countries which are Members of the WTO shall be subject to the provisions which are applicable to other developing country Members according to paragraph 2(b) of Article 27 when GNP per capita has reached $1,000 per annum: . . . Sri Lanka . . .

SCM Agreement, Annex VII.  Regardless of Sri Lanka's status at the time of the SCM Agreement's adoption in 1994, the absence of any reference to later dates in Annex VII suggests it was intended to adjust to changes in countries' development status over time.  Regarding Subsection (a), Sri Lanka was not designated as an LDC by the United Nations in 2015.  See, e.g., United Nations, World Economic Situation and Prospects 2015 143, Table F (2015), available at www.un.org/en/development/desa/policy/wesp/wesp_archive/2015wesp_full_en.pdf.  Benefits under Subsection (b) expired at the same time as that provided under 19 U.S.C. § 1671b(b)(4)(C)(i).  See SCM Agreement, Art. 27.2(b).

8 years after the date the WTO Agreement enters into force."  19 U.S.C. § 1671b(b)(4)(D)(i).

The WTO Agreement entered into force on January 1, 1995, therefore Sri Lankan companies

could not have benefitted from the terms of 19 U.S.C. § 1671b(b)(4)(C)(i) during the period of

investigation, which was over eight years later.

## II.    TCENTP Program

The TCENTP program was established by Sections 51 and 52 of Sri Lanka's Inland

Revenue Act No. 10 of 2006.  GOSL's CVD Questionnaire Response: Certain New Pneumatic

Of-The-Road Tires from Sri Lanka, C-542-801, POI 01/01/2015-12/31/2015, Section II, at 6,

Attach. 1, at 112 (April 21, 2016) ("GSL CVD Q. Response").  Over the relevant period, the

TCENTP program provided income tax rates of twelve percent for companies involved in certain

"specified undertakings."  Id., Section II, at 8.  Over the same period, Sri Lanka's standard

corporate income tax rate was twenty-eight percent.  GOSL's CVD Supplemental and Second

Supplemental Questionnaire Response:  Certain Of- The-Road Tires from Sri Lanka, C-542-801,

POI 01/01/2015-12/31/2015, First Supp. Q. at 3 (May 20, 2016).

Section 1677(5)(B) provides that a subsidy requires that:  (1) "a government of a country

or any public entity within the territory of the country;" (2) "provides a financial contribution;"

(3) "to a person;" and (4) "a benefit is thereby conferred."  19 U.S.C. § 1677(5)(B).  See

Delverde, SrL v. United States, 202 F.3d 1360, 1365 (Fed. Cir. 2000).  To be countervailable, a

subsidy must also be specific.  19 U.S.C. § 1677(5)(A); 1677(5A).  It is undisputed that the

actors involved in the TCENTP program satisfy elements one and three of the subsidy definition.

Commerce further concluded that the TCENTP program provided a financial contribution,

conferred a benefit to Camso, and was specific.  <u>Final Det. I&D Memo</u> at 16.  GSL challenges

Commerce's conclusions on all three points.  Pl. Br. at 17–22.

First, GSL objects to Commerce's finding that the TCENTP program provided a financial

contribution.  Pl. Br. at 19–20.  GSL argues that the TCENTP program represented its sovereign

exercise of tax policy rather than "revenue foregone".  <u>Id.</u> at 19.  In relevant part, the definition

of "financial contribution" covers:  "foregoing or not collecting revenue that is otherwise due,

such as granting tax credits or deductions from taxable income."  19 U.S.C. § 1677(5)(D)(ii).  As

the name "Tax <u>Concession</u> for Exporters of Non-Traditional Products" suggests, the TCENTP

program reduced the income tax rate applicable to exporters of certain qualifying merchandise.

GSL CVD Q. Response, Section II, at 13.  As a result of the TCENTP program, Camso received

a sixteen percent reduction in its income tax liability, from twenty-eight percent to twelve

percent.  <u>Prelim. Det. I&D Memo</u> at 13.  Tax revenue was likewise foregone by GSL in the

amount of the sixteen percent difference.  Accordingly, Commerce's financial contribution

finding was supported by substantial evidence.

GSL next challenges Commerce's conclusion that the TCENTP program was specific for

purposes of 19 U.S.C. § 1677(5A).  Pl. Br. at 20–22.  GSL points out that TCENTP program

benefits were available to a multitude of exporting industries, and even some non-exporting

industries.  <u>Id.</u> at 21.  The TCENTP program provided tax concessions for the following

"specified undertakings":

(i)     the export of non-traditional goods, manufactured, produced or purchased
         by such undertaking; or
(ii)    the performance of any service of ship repair, ship breaking repair and
         refurbishment of marine cargo containers, provision of computer software,
         computer programs, computer systems or recording computer data, or

> such other services as may be specified by the Minister by Notice published in the Gazette, for payment in foreign currency.

GSL CVD Q. Response, Section II, at 13, Attach. 1, at 121.  Subsection (i) is clearly contingent upon export performance, as it requires that a company export non-traditional goods.  Non-traditional goods are defined in Section 60 of the Inland Revenue Act to mean "goods other than black tea in bulk, crepe rubber, sheet rubber, scrap rubber, latex or fresh coconuts or any other produce referred to in section 16," which referred to agricultural undertakings.  GSL CVD Q. Response, Section II, at 7, Attach. 1, at 122.  Camso's export of OTR tires thus satisfied the terms of the first subsection.  Export subsidies are one class of specific subsidy.  19 U.S.C. § 1677 (5A)(A).  "[A]n export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions."  19 U.S.C. § 1677(5A)(B).  Regardless of the full breadth of industries and businesses to which the TCENTP program applied, the fact that the subsection under which Camso qualified was contingent upon export performance demonstrates that the TCENTP program constituted an export subsidy as applied to Camso, and was thus specific for purposes of Section 1677(5A).[2]  The statute does not require that exporters be the only foreseeable beneficiaries of the TCENTP program, or that the number of exporters impacted be limited, in order for it to be classified as an export subsidy vis-à-vis Camso.

---

[2] Section 1677 defines the various categories of specific subsidies in the alternative, e.g., a subsidy can be specific if it is either an export subsidy or a qualifying domestic subsidy.  19 U.S.C. § 1677 (5A)(A).  Having found that substantial evidence supports Commerce's conclusion that the TCENTP program constituted an export subsidy, the court need not assess GSL's arguments regarding the degree to which the TCENTP program satisfied the definition of a domestic subsidy.  See Pl. Br. at 20–22.

GSL also contends that the intent of the program was not to strengthen the tire industry or any other particular industry, but rather to bolster the general economic situation in Sri Lanka. Pl. Br. at 22. The statute is clear, however, that specificity may be found without regard to the intent of the measure. 19 U.S.C. § 1677(5A).

Finally, GSL claims that a separate, one-time Super Gains Tax equaling twenty-five percent of Camso's taxable income nullified any alleged benefit conferred by the TCENTP program. Pl. Br. at 22–23; GSL CVD Q. Response, Section II, at 8; GSL Verification Report at 3. It argues that the "effective tax rate" applied to Camso during the POI was thirty-seven percent, i.e., twelve percent under the TCENTP program and twenty-five percent under the Super Gains Tax. Pl. Br. at 23. In assessing the benefit provided by a direct tax program, Commerce's regulations provide: "In the case of a program that provides for a full or partial exemption or remission of a direct tax (e.g., an income tax) . . . a benefit exists to the extent that the tax paid by a firm as a result of the program is less than the tax the firm would have paid in the absence of the program." 19 C.F.R. § 351.509(a).

The Super Gains Tax was imposed on Camso because its pre-tax profits for the year beginning April 1, 2013, exceeded two billion Sri Lankan rupees. See GSL CVD Q. Response at Section II, p. 8. Pursuant to Commerce's regulations, to claim that the benefit conferred by the TCENTP program was nullified by the application of the Super Gains Tax, GSL would have to prove that the net effect of the TCENTP program somehow yielded a tax rate greater than or equal to the tax rate which Camso would have paid absent the TCENTP program. See 19 C.F.R. § 351.509(a). This it did not do. Due to the pre-tax nature of Super Gains Tax eligibility, companies qualified without regard to other corporate income tax liabilities. Without the

TCENTP program, it appears that Camso's tax rate would have equaled the twenty-eight percent

standard corporate tax rate, plus the twenty-five percent Super Gains Tax on Camso's pre-tax

profits.  Thus, the court finds Camso's benefit intact.  The court concludes that Commerce's

determinations with respect to the countervailability of the TCENTP program are supported by

substantial evidence and are in accordance with law.

## III.    GPS Program

GSL and Camso both argue that Commerce's determination that the GPS constituted a

countervailable subsidy benefitting Sri Lankan OTR rubber tire manufacturers was contrary to

law and unsupported by substantial record evidence.  GSL stated that the purpose of the GPS

was to encourage small rubber holdings in Sri Lanka, not aid manufacturers.  Verification of the

Questionnaire Responses of the Government of Sri Lanka, C-542-801, POI: 01/01/2015-

12/31/2015, at 6 (Dep't Commerce Sept. 28, 2016) ("GSL Verification Report"); GSL NSA

Supp. Q. Response, Attach. 1, at 3.  The GPS guaranteed rubber holdings of no more than 50

acres a certain price per kilogram for rubber sold in Sri Lanka.[3]  Essentially GSL would set an

above-market "guaranteed price" for rubber smallholders, calculate a "market price" to be paid

by purchasers, and assume responsibility for paying the difference between the "guaranteed

price" and the "market price."  GSL Verification Report at 6–7.  Relevant to this analysis, both

---

[3] Sri Lankan rubber products manufacturers were not required to rely on locally-sourced rubber, and were ostensibly able to import rubber during the GPS; GSL Verification Report at 9, Camso indicated, however, that "Camso cannot import all of its rubber because the GOSL will not give it sufficient import permits, given that the GOSL is encouraging domestic rubber sales. [Camso] officials stated that Camso needs to apply for import permits frequently and these permits take three to four weeks to approve," Verification of the Questionnaire Responses of Camso Loadstar (Private) Ltd. and Loadstar (Private) Ltd., C-542-801, POI: 01/01/2015-12/31/2015, at 12 (Dep't Commerce Sept. 28, 2016) ("Camso Verification Report").

the method of disbursing the difference and the method of calculating the "market price" evolved

during the program's existence:

- **Method 1** (11/15/2014 – 12/22/2014):  The market price was the average Colombo rubber auction price for the previous month.  GSL disbursed the difference directly to rubber smallholders.  GSL Verification Report at 6.
- **Method 2** (12/23/2014 – 02/09/2015):  The market price was the Singapore International Commodity Exchange ("SICOM") average price for the prior month.  Rubber buyers, e.g., Camso, paid smallholders the entire guaranteed price.  Later, GSL reimbursed rubber buyers in the amount of the difference between the market price and the guaranteed price.  Id. at 7.
- **Method 3** (03/15/2015 – 06/30/2015):  The market price was the SICOM average price for the prior month.  GSL disbursed the difference directly to rubber smallholders.  Id.
- **Method 4** (07/01/2015 – 09/30/2015):  The market price was the average price of all rubber categories for the previous month in ten Sri Lankan markets from five regions.  Rubber buyers, e.g., Camso, paid smallholders the entire guaranteed price.  Later, GSL reimbursed rubber buyers in the amount of the difference between the market price and the guaranteed price.  Id. at 7, 10.

See also Certain Off-the-Road Tires from Sri Lanka: Verification Exhibits, C-542-801, POI: 01/01/2015-12/31/2015, Ex. 3 at 5–10 (Dep't Commerce Sept. 2, 2016).  The changes in program administration were motivated by complaints regarding payment delays, first from smallholders, and later from rubber buyers.  GSL Verification Report at 11.  While program implementation was smooth under Method 4, the government's budget was insufficient to continue it.  Id.  GSL contended that Camso was not a beneficiary under the GPS and, due to the fact that Camso "would have to wait until the administrative process is concluded to obtain its reimbursement, in fact, the program imposes a burden rather than a benefit."  GSA NSA Supp. Q. Response at Attach. 4, at 3.  Commerce's verification report indicated that the payments ultimately received by Camso under the GPS accurately reflected the amount above the set market price actually paid to smallholders.  GSL Verification Report at 9–10.

Commerce found the entirety of the reimbursement payments to Camso under Methods 2 and 4 to be countervailable subsidies.  See Post-Prelim. Memo at 3 (assigning a 0.88 percent ad valorem rate); Corrected Program Rates, at 1 (assigning a 0.95 percent ad valorem rate); Final Det. I&D Memo at 8, 20–22 (explaining what was found to be countervailable).  Commerce assessed the reimbursements in isolation from the overall GPS program.  See, e.g., Defendant's Response to Motions for Judgment on the Agency Record, ECF No. 61, at 17 ("Def. Br.").  With minimal analysis, it concluded the reimbursements were "a financial contribution in the form of a direct transfer of funds and a benefit under sections [19 U.S.C. § 1677(5)(D)(i)] and [19 U.S.C. § 1677(5)(E)], respectively."  Post-Prelim. Memo at 3.  See also Final I&D Memo, at 21–22.

It is undisputed that GSL's Ministry of Plantation Industries is a governmental entity. The parties disagree as to whether the GPS reimbursements constituted a "financial contribution" or a "benefit."  Initially, the court concludes that Commerce's approach, selectively analyzing the reimbursement payments in isolation from the overall GPS program, is not in accordance with Section 1677(5)(C).

Commerce is not required to consider the effect of a subsidy where the other elements of the countervailable subsidy are satisfied.  19 U.S.C. § 1677(5)(C).  See also Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 926 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4240 ("SAA")[4] (indicating that this provision was prompted by a prior holding that "Commerce must determine that the practice has an effect on

---

[4] The SAA is an "authoritative expression" when interpreting and applying the Uruguay Round Agreements Act. 19 U.S.C. § 3512(d) (1994). See also Micron Tech., Inc. v. U.S., 243 F.3d 1301, 1309 (Fed. Cir. 2001).

the price or output of the merchandise under investigation"). This does not authorize Commerce,

however, to ignore clear, readily available, and already-verified[5] record evidence that a transfer

of funds constituted repayment of a debt. Commerce cited no authority to the contrary. See Def.

Br. at 13–15, 18–19.

Section 1677(5)(D) and (E) indicate that "financial contribution" is a concept distinct

from that of a "benefit." "[T]he statute clearly requires that in order to find that a person

received a subsidy, Commerce determine that that person received . . . both a financial

contribution and benefit, either directly or indirectly, by means of one of the acts enumerated."

Delverde, 202 F.3d at 1366. Section 1677(5)(D) defines a "financial contribution" to include,

inter alia, "the direct transfer of funds, such as grants, loans, and equity infusions." 19 U.S.C. §

1677(5)(D)(i). See also S. Rep. 103-412, at 91 (1994) (mentioning the further example of loan

guarantees). GSL and Camso argue that, because money received by Camso constituted

repayment of a debt incurred by GSL, no such contribution was made. Pl. Br. at 12–13;

Consolidated Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, ECF No. 59, at

12–15 ("Consol. Pl. Br."). Commerce argues that GSL's mere transfer of a certain amount of

money to Camso satisfies the requirements of Section 1677(5)(D)(i). Def. Br. at 14.

---

[5] Commerce's report indicated that, regarding reimbursements under Methods 2 and 4, Commerce verified that Camso's own rubber purchase records, as well as those provided to GSL during the GPS, approximated the relevant reimbursement figures. See Camso Verification Report at 11–12 (Regarding Method 2, "[Commerce] tied several of the above reimbursement applications to source documentation provided to the Rubber Development Department (RDD) Head Office in support of the requests and noted no discrepancies." Regarding Method 4, "[c]ompany officials stated that the RCCs prepare their own calculations to track the amounts expected from the RDD; we reviewed the spreadsheet related to applications in July 2015. We selected an item shown on this spreadsheet and tied it to the corresponding payment received from the RDD. We noted no discrepancies.").

Commerce's argument, however, ignores the instructive value of the illustrative examples provided by Section 1677(5)(D)(i). The interest-free repayment of a debt owed is unlike a grant, loan, or equity infusion. In all four cases the recipient receives funds, but the latter three transfers yield a net increase to the recipient's capital base at the time of the infusion, whereas interest-free repayment of a debt does not. Notwithstanding that Commerce's determinations under Section 1677(5)(D)(i) are "made on a case-by-case basis,"[6] SAA at 927, 1994 U.S.C.C.A.N. at 4240, this fundamental difference suggests that Section 1677(5)(D)(i) did not contemplate debt repayment, at rates less advantageous than commercial markets, as a financial contribution.

Furthermore, even if the debt repayment were a qualifying financial contribution, the benefit question is dispositive in this case. The GPS program did not provide a "benefit" to Camso within the meaning of Section 1677(5)(E) in the total amount of the reimbursement. Under that statute, "[a] benefit shall normally[7] be treated as conferred where there is a benefit to the recipient, including" an equity infusion "inconsistent with the usual investment practice of private investors," a loan provided below commercial market rates, a loan guarantee wherein the

---

[6] In its entirety, the SAA indicates: "[Section 1677(5)(D)] lists the four broad generic categories of government practices that constitute a 'financial contribution.' The examples of particular types of practices falling under [Subsection (D)(i)] are not intended to be exhaustive. The Administration believes that these generic categories are sufficiently broad so as to encompass the types of subsidy programs generally countervailed by Commerce in the past, although determinations with respect to particular programs will have to be made on a case-by-case basis." SAA at 927, 1994 U.S.C.C.A.N. at 4240.

[7] "In using the word "normally" in this subparagraph, the Administration intends only to indicate that in the case of certain types of subsidy programs, such as export insurance schemes, the use of the benefit-to-the-recipient standard may not be appropriate." SAA at 927, 1994 U.S.C.C.A.N. at 4240.

recipient would pay more in absence of the authority's guarantee, after adjusting for differences in guarantee fees, the provision of goods or services for "less than adequate remuneration," or the purchase of goods or services for "more than adequate remuneration."   19 U.S.C. § 1677(5)(E).  See also 19 C.F.R. § 351.504–508.  While the foregoing list is not exhaustive, there are critical differences between the examples listed above and the reimbursement payments received by Camso.   In serving as a payment vehicle for the GPS, Camso was effectively providing interest-free loans to GSL.  This was to Camso's detriment, rather than its benefit.

Commerce attempts to dilute the requirement that countervailable subsidies benefit a recipient by reference to Section 1677(5)(C)'s elimination of any requirement to consider the subsidy's effects.  Def. Br. at 16–17.  Both the structure of Section 1677 and the SAA, however, indicate that the two concepts are distinct:   "The use of 'normally' [in Section 1677(5)(E)] should not be construed as suggesting that, in addition to identifying the benefit to the recipient, Commerce should or must consider the effect of the subsidy; [Section 1677(5)(C)] already makes this clear."   SAA at 927, 1994 U.S.C.C.A.N. at 4240.   Commerce's own regulations likewise recognize this.  19 C.F.R. § 351.503(c).  See also 63 Fed. Reg. at 65,361 ("In analyzing whether a benefit exists, we are concerned with what goes into a company, such as enhanced revenues and reduced-cost inputs in the broad sense that we have used the term, not with what the company does with the subsidy.").  Commerce need not consider the overall pricing effect of the GPS reimbursements or their influence on Camso's behavior to recognize that the series of debts and repayments between Camso and GSL yielded no benefit to Camso within the meaning of Section 1677(5)(E).

For the sake of completeness, the court addresses potentially applicable regulations. Broadly, Commerce's regulations provide for certain categories of benefits, see, e.g., 19 C.F.R. § 351.504 (applicable to grants), and a residual provision, which applies to "program[s] for which a specific rule for the measurement of a benefit is [not] contained in this subpart," 19 C.F.R. § 351.503(a). See also Preamble: Countervailing Duties, 63 Fed. Reg. 65,348, 65,360 (Dep't Commerce November 25, 1998) (describing the residual nature of this provision). The confusion in Commerce's brief is telling. Without applying Section 351.503, it likens the GPS reimbursements to a grant under Section 351.504, and yet avoids stating that GPS reimbursements constituted a grant.[8] Commerce's investigatory documents provide no further clarification as to the specific type of benefit alleged. See Post-Prelim. Memo at 3; Final I&D Memo at 22.

Neither the Tariff Act, as amended, nor Commerce's regulations define "grant." See 19 U.S.C. § 1677; 19 C.F.R. § 351.504(a). See also 63 Fed. Reg. at 65,362. The court thus assumes that the word carries its ordinary meaning, which may be found in a dictionary. See, e.g., Koyo Seiko Co. v. United States, 36 F.3d 1565, 1571 n.9 (Fed. Cir. 1994). "Grant" is ordinarily defined as "2: something granted; esp: a gift (as of land or a sum of money) usu. for a particular

---

[8] Compare Def. Br. at 14 n.3 ("The calculation of Camso's subsidy rate under this program was therefore similar to that applicable to grants, for which a benefit exists in the amount of the grant") (emphasis added); with id. at 15 ("[GPS] transfers increased Camso's revenues by their full amount."). See also 19 U.S.C. § 1677(5)(E); 19 C.F.R. § 351.504(a)); id. at 22 ("Commerce was countervailing Sri Lanka's direct payments to Camso --- not subsidized purchases of rubber. Accordingly, the applicable date of the financial contribution is the date of Sri Lanka's payment to Camso . . . See, e.g., 19 C.F.R. § 351.504(b) (providing that, for grants, Commerce will normally find a benefit as conferred on the date of receipt)). Commerce alternatively attempts to analogize the GPS reimbursements to tax abatements. Def. Br. at 16 (citing 19 C.F.R. § 351.509, (continued . . . )

purpose . . . 3a:   a transfer of real or personal property by deed or writing – compare ASSIGNMENT 3a, GIFT 2a."   Grant (Noun), Webster's Third New Int'l Dictionary (unabridged 1981) (example sentences omitted).   See also Changzhou Trina Solar Energy Co. v. United States, 264 F. Supp. 3d 1325, 1335 (Ct. Int'l Trade 2017) ("Commerce concluded that a grant with a positive balance provides the recipient with a benefit . . . Commerce reasonably concluded here, from the positive account balances, that these grants had been received.") (emphasis added).   Applying this definition, payments to Camso under the GPS did not constitute a gift-like transfer, but rather the interest-free repayment of a debt, as described above.   Thus, the GPS reimbursements do not fall within the regulatory provisions applicable to grants.

Commerce's regulatory catch-all provision provides:   "For other government programs, the Secretary normally will consider a benefit to be conferred where a firm pays less for its inputs . . . than it otherwise would pay in the absence of the government program, or receives more revenues than it otherwise would earn."   19 C.F.R. § 351.503(b)(1).   The touchstone of Section 1677(E), from which this regulation is derived, is that what the company received somehow exceeded what the company paid or should have paid.   Often, this is tested by reference to what would otherwise be available under normal market conditions.   Commerce makes much of the following examples of "benefits" from the regulatory preamble:   First, a government regulation mandates use of environmentally-friendly equipment, and also covers part of the cost of acquiring said equipment.   Def. Br. at 16 (citing 63 Fed. Reg. at 65,361).   Second, a government requires that automakers install seat belts, and also covers part of the cost

---

510).   This approach is unavailing.   As Commerce does not even allege that the GPS program involved a tax, it cannot fall under those regulations.

of installation.  Id.  The court agrees that these examples are instructive, but finds that they favor GSL and Camso's position.

For example, these examples describe, first, the requirement to install environmentally-friendly equipment and, second, the partial subsidy of their purchase as "separate actions."  63 Fed. Reg. at 65,361.  Commerce attempts to co-opt this language by describing the requirement to front money to rubber smallholders and the later repayment of that money using the same terms.  Def. Br. at 16.  In the examples from the regulatory preamble, the required "improvements" to the product enhance the product in some way and the government covered some of the cost of the enhancement, i.e., the government provided value.  The GPS program as analyzed by Commerce thus far, however, did not provide Camso with any value.  Translated into the terms of the environmental equipment example, it was rather as if Camso already possessed environmentally-friendly equipment, the government expropriated the equipment, and later returned it to Camso without compensation.  The GPS is not separable as are those acts described in the regulatory preamble.

The relevant portion of the regulatory preamble concludes:  "In the two examples, the government action that constitutes the benefit is the subsidy to install the equipment, because this action represents an input cost reduction."  63 Fed. Reg. 65,361 (emphasis added).  Commerce has not identified what "input" was made cheaper by GSL's reimbursement payment.  By countervailing the entirety of the reimbursement payments, Commerce suggests the "input" concerned is simply the cash itself.  As explained above, however, this was made more expensive by the GPS, which required that Camso supply the funds, i.e., provide a loan, in exchange for an interest-free repayment.

Finally, the regulatory preamble indicates that the prototypical example of a company receiving more revenues than it otherwise would earn is "when a firm sells its goods to the government and 'such goods are purchased for more than adequate remuneration.'"  63 Fed. Reg. at 65,360.  The GPS reimbursements bear no resemblance to that sort of situation.  Camso received no overpayment.  Commerce verified that Camso simply received the same excess amount which it had previously paid to the rubber smallholders.  In sum, the GPS satisfies neither the statutory definition, nor the regulatory interpretation of what constitutes a benefit. Commerce's determination that the GPS reimbursements constituted a subsidy is therefore not in accordance with law.

Plaintiffs' briefs suggest that the GPS' countervailability would be properly assessed through an upstream subsidy analysis.  Pl. Br. at 13; Consol. Pl. Br. at 19–23.  Such an analysis would test whether any GPS benefits which may have accrued to rubber smallholders had "a significant effect on" the cost of Camso's OTR rubber tire production.  19 U.S.C. § 1677-1.  See also 19 C.F.R. § 351.523.  Commerce simply responded that such an analysis was unnecessary because Commerce only countervailed GSL's reimbursement payments to Camso.  Def. Br. at 20–22.  As both parties have not substantively addressed whether an upstream subsidy existed, it would be premature for the court to make its own determination.  Having concluded that GSL's reimbursement payments did not constitute a benefit per se, however, Commerce may wish to conduct a full upstream subsidy analysis on remand, or otherwise examine whether some part of the reimbursement actually benefitted Camso.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motions for judgment on the agency record are **GRANTED** in part.  Commerce's findings regarding the TCENTP program are **SUSTAINED**.  This matter is **REMANDED** for Commerce to re-calculate the net countervailable subsidies applicable to Camso, eliminating any duties attributable to GPS based on mere reimbursement for excessive rubber payments.  Commerce is free to assess whether the GPS program otherwise benefitted Camso or provided an upstream subsidy to Camso within the meaning of 19 U.S.C. § 1677-1.  Commerce shall have until May 14, 2018, to file its remand results, or request an extension should it determine to conduct further investigation.  The parties shall have until May 29, 2018, to file objections, and the government shall have until June 13, 2018, to file its response.

                                                                   /s/ Jane A. Restani
                                                                 Jane A. Restani, Judge

Dated: April 17, 2018
        New York, New York